## Case No. 3,962.

DOGGETT v. EMERSON et al.

[1 Woodb. & M. 195.][1]

Circuit Court, D. Maine. May Term, 1846.

EQUITY—RESCISSION OF SALE OF LAND — REPAYMENT OF CONSIDERATION — JOINT PURCHASERS AND AGENT—INTEREST — DISCHARGE IN BANKRUPTCY—DELAY IN PLEADING AS DEFENSE.

1. Where timber had been cut from land by the grantee of the land, and the money not realized when a decree was rendered, that he was liable to account for it, he having rescinded the contract, he was required to file a satisfactory bond to pay the amount as soon as collected.

[Cited in Smith v. Babcock, Case No. 13,009.]

2. If four persons agree to purchase of the state a tract of land, and give their joint note for the consideration, and take a writing from the agent of the state to make a deed on demand, and they authorize one of their number, in writing, to take a deed of the same and sell it for the whole, each being entitled to the extent of one fourth by their private agreement, that one has an interest in the whole as agent, besides his interest as principal in one fourth. And if he gets a deed from the state for one eighth running directly to a purchaser of one eighth, instead of one to himself, and then from himself to the purchaser, he is answerable for the whole consideration received, on the sale being rescinded

[Cited in Mason v. Crosby, Case No. 9,234.]

3. But if after the sale, he divided the whole of it between the other three owners, concluding to keep as his own share the other one fourth of the land, having sold in all to various persons

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

three fourths of it, the other three are responsible to refund, in aid of him, the one third each received.

4. If a sub-agent receives from the vendee a part of the purchase money, and pays it over to the principal, taking land instead of it for his compensation, the principal is liable (on a rescission of the purchase for fraud) to repay that part as well as what he received directly.

5. Where a conveyance is set aside for gross misrepresentations and deceit, the ground of the decision must be considered to have been fraud, and in such a case, interest is to be paid on the money refunded, without reference to any demand, and from the time it was received, and interest on the interest from the time of its payment on any of the notes originally given.

6. Where one of the respondents was discharged as a bankrupt in November, 1843, but showed no efforts to plead it till April, 1845, and in July, 1846, after the case had been published and an opinion given on the merits, moved to be allowed to avail himself of it; the court considered the application too late, and the subject-matter of this bill, a claim in equity to rescind a contract, as one not provable under the bankrupt law.

[This was a bill in equity by John Doggett against William Emerson and others.]

This case came before the court again at an adjourned session of the May term, 1846, on exceptions to the report of the master in chancery upon the decree against the respondents, rendered at May term, 1845. The original opinion of the court was delivered in August, 1845, by Justice Story, and is now published in Doggett v. Emerson [Case No. 3,960], and a decree was prepared to carry it into effect; and both were communicated to the parties at a sitting held by their agreement under a continuance nisi. Objections being made to entering up the decree, after the death of Judge Story, the parties were heard on that point, and a request was made for a rehearing of the cause, at the October term, 1845. Afterwards, during that term, an opinion was pronounced by Woodbury, J., for the court against the respondents on these points. Doggett v. Emerson [Case No. 3,961]. The master then proceeded to make the inquiries which were submitted to him, and reported thereon at May term, 1846. Exceptions were filed to his report by all the parties, and were argued at an adjourned session of the court, held at Portland, July 7th, 1846. Enough of the report and exceptions will be stated in the opinion of the court to show the grounds of the questions. The case was continued nisi, and judgment pronounced at Boston, September 8th, 1846.

W. P. Fessenden, T. Fessenden, and Mr. Deblois, for Doggett.

Rogers and Rowe, for Emerson, Farren and Roberts.

McCrillis and Poor, for Norcross and Mason.

WOODBURY, Circuit Justice. The objection taken to the report in this case for not allowing a deduction to the respondents on account of timber, which had been cut recently, but not sold, is disposed of by the subse-

quent agreement of the parties to any mode of arranging it, which shall appear just to the court, and shall avoid delay. I therefore direct, on this point, that beside the allowances, specified in the report for timber cut on the land and sold, the further quantity, found by the master to have been cut, but the proceeds not then realized, is to be allowed and deducted, if they have been so realized when the judgment is entered up; and if they have not been at that time, the complainant is to file a bond with satisfactory sureties, to pay the same on demand to Emerson in trust for those entitled to it, in the proportions in which the consideration paid by Doggett for the land in controversy shall be actually refunded by them.

Most of the other exceptions in this case may be resolved into three general heads. 1st. That which concerns the title of Emerson. 2d. That relating to the computation of interest. 3d. And that concerning the amount of principal which should be refunded.

In relation to the question about Emerson's title to the land, I entertain no doubt except on the point, whether his interest was so extensive that he should be charged in the first-instance for the whole consideration, or only one fourth of it. That he was a party in interest to some extent, must have been decided by the judge who made the decree, or he would probably have directed the bill to be dismissed in respect to Emerson. From the proof in the case, also, it is manifest, that he was, in truth, one of the purchasers of the land in dispute. from the state. That beside this, he was one who joined with the other owners, as copartners in interest, in authorizing himself, as agent of all of them, to dispose of the land on certain specified conditions; that he made the sale and took the money and notes therefor—the notes running to himself on account of the owners, who had constituted him agent; and that though in one of the writings given to Williams. he speaks of reserving one fourth of the land from sale for himself and some other persons, yet he then took no deed of that fourth from the state to himself, or to himself and others; nor did he take any afterwards when the consideration was divided; nor did he then take releases or quit-claims from the other owners. Whatever intentions or expectations he may have then formed of retaining one fourth for himself and some of the other owners, or whatever arrangements he and the other owners made by parol at the time of the division of the consideration, the legal title, after the purchase from the state, stood thus. Till different and actual conveyances some time after, made it otherwise, it must be regarded either as in the state alone. (no deed having then been executed by the state of the one fourth,) or if in the respondents, under the contract with the state, then in all of them jointly; as all jointly are named in the receipt for the money and in the promise to convey, which was made by the agent of the state, and all jointly had become responsible to the state by joint notes for the consideration. If we go next to the collateral evidence, it seems that the state was to convey to all of them, including Emerson, and that his portion was to be one fourth, Farren one fourth, Roberts one fourth, and Norcross and Mason, as a commercial firm, one fourth.

Looking still further to the written power given by all of them to Emerson, as their agent, to sell the whole at a given price, it was signed by all, and evidently contemplated that Emerson should take a deed of the whole land from the state, and sell the whole on account of all as owners of undivided portions. Thus, the promise by the agent of the state to convey the land, is in terms made to them all by name; and agrees "to deed the same to them, whenever they shall call on me for that purpose at the land office," and bears date February 21st, 1835. The same day they all by name jointly empowered Emerson "to take a deed of the same," which must be of the whole, and to sell it, "if opportunity should present," and account for it in four equal shares, such being recited to be their true liabilities on the notes to the state. It is contended by the respondents, that the construction of this power is, that Emerson should sell the whole of this interest or none, and not three fourths of it; and when the proceeds of the sale of three fourths were divided, it is believed that the settlement was closed on that basis. by his paying over to the others all which the whole of their shares would sell for, and retaining in himself all the one fourth,—the residue of the land not sold. It may be sound law, that in a case like this, a power to sell the whole land would not imply a power to sell a part at the same rate undivided, though we see no evil in a construction of the power allowing a sale of a part, except that it would admit new co-owners not wanted. But the proprietors were liable to that before by Emerson's selling his own one fourth to whomsoever he pleased. It is not, however, necessary to decide this question, as the parties agreed anew and after the sale, to treat this as a sale of the whole of all the interests of all the co-owners except Emerson. This, it is supposed, they also completed by deeds at some subsequent period, though not at that time. In any legal view, then, of the title and the written agreements at the time of the sale to Doggett, Emerson must be considered as having at first the title to the whole land as agent for the whole, (regarding in equity that as done which was agreed to be done,) or he must be considered as having the title of one fourth undivided as principal, which all concede he was to receive as one of the principals, and which he maintains is still in him. He was, then, interested at the time of the sale, and had a title to something

as fully as any of them, but to how much we will examine further hereafter. As another guide in coming to a conclusion, whether he is to be treated as then having some interest in the land conveyed, and hence to be liable for some of the consideration, it is manifest that the purchasers looked to him alone, through Williams, his sub-agent, for obtaining this title. That he wrote to the agent of the state to make the deed to the complainant, of his one eighth; that the notes for the consideration ran to him, or were indorsed by Williams to him alone; and that, if any other circumstance had occurred, rendering an action at law proper for recovering back the money paid to the plaintiff, it could have been sustained against Emerson; or if the money received by Emerson of Doggett had proved to be counterfeit, that Emerson in his own name could have sued Doggett to recover the whole amount. It is my opinion, then, that Emerson was interested in the land not only for one fourth, but that the legal rights of the parties, at the time of the sale to the complainant, were in Emerson as agent for the whole, to demand and receive a deed of the state for the whole; and then to convey to purchasers such portion as he was authorized to, as agent for all. The title to the whole must, then, be considered to have been in him when the plaintiff bought, to be disposed of for the benefit of himself and the rest of the purchasers in conformity to his contract with them. So situated, he sells one undivided eighth to the complainant. It was one eighth of the whole and not of three fourths. It gave a title to partition of the one eighth, out of and from the whole, not out of three fourths; and the only distinction or difference in the case from this is one of form, and arises from the circumstance, that the conveyance was made directly from the state to the vendee by Emerson's request, rather than first to Emerson and then by him to the vendee. This cannot, however, alter the equitable or legal view of the transaction as among these parties. Emerson thus bargained away, as holder in trust, as agent for all the owners, this one eighth of the whole land. He conveyed it to the plaintiff through the state— he received the whole consideration—and, on account of all this, if the conveyance be avoided, he must be considered as in the first instance, liable for the whole.

In the next place, having paid over that consideration to the other respondents, as each was originally entitled to one fourth of it, considering Norcross and Mason as one firm, they are each, as original owners to that extent in the whole, bound to refund one fourth. Here the case on this point would end, looking to no subcontract, or arrangement among these parties subsequent to the sale, and generally looking to none, in fixing the liability if made with others beforehand, and not before it had been carried into legal effect. For this reason, I do not regard, as affecting the liability under this bill, the subsequent agreement of Le Breton and Moody to buy of Norcross and Mason, and another sub-contract with Goss and Mitchell, and others of like character referred to. But as Emerson and all the other parties to the bill concur in admitting, that before the consideration was actually divided, they agreed, that the others should take one third of it instead of one fourth, and consider the three fourths of the whole land sold to Emerson as their three fourths, and the one fourth retained as his—it seems right, in considering the amount of damages or money to be returned, to make them refund one third each in aid of Emerson. This does not affect the question of liability, but merely the amount which it is equitable for some to refund, and is distinguishable from other arrangements, either with others not parties, or among parties at subsequent periods; and it conforms to the truth of the case among those possessing the legal title. It makes Emerson liable at first for all, as entitled to a deed of all from the state as agent, and then the others liable in aid of him for all, as they afterwards agreed to be. This conclusion, as to Emerson's liability to refund all, would not be very different, if Emerson had possessed no title to the whole. In cases of this kind, where there is an agency coupled with an interest in the land, or an interest in the consideration of the sale, though not in the land itself, we see no objection in principle where the agent receives actually, in the first instance, the whole consideration, and through fraudulent representations of himself and others under him, the sale is avoided, why he should not be held responsible for refunding the whole. Such is not the case of a mere naked agent or attorney, receiving money and paying it over for the purpose received, and who may be exonerated afterwards in certain cases, from liability to refund. But it is the case of an agent or attorney interested in the matter sold and interested in the proceeds, and one whose misconduct renders a return of the consideration proper. In such case, therefore, his liability to refund the whole is certainly not very questionable on that ground.

In Daniel v. Mitchell [Case No. 3,563] the agent was held responsible for refunding the whole which had passed through his hands, making at the same time all, who were parties to the bill and had received portions of the consideration, contribute and repay the amounts they had respectively received.

In the present case, if we look to the strict legal title to this land, before the one eighth of it now in controversy was conveyed by the agent of the state to the complainant, it was in the state alone. And looking to that exclusively, and not the receipt of the money, none of the respondents could be made to refund the consideration, and take a reconveyance. But the reconveyance would be to the state, or agent of the state, who gave the

deed to the complainant, and the state should be required, or its agent, to refund that portion of the consideration which he virtually received for this one eighth through the respondents on their joint note. This whole proceeding, however, has been instituted and carried on without reference to any liability by the state, but on the ground of liability and rights under the state; as if the state had made such a conveyance as it was bound in law and equity to make, under the written agreements about this land, before the sale to the plaintiff. The agent of the state at first delayed to give a deed, merely because the contract was not made at the seat of government, where the papers existed which it was necessary to refer to. The delay to make one soon afterwards to the owners or their agent, and by them or him to other purchasers, arose either from a desire in the purchasers to avoid the expense of double deeds, or from a wish not to make any covenants or warranties. In any fair view, then, of the rights and relations of these parties, my conclusion on this branch of the master's report, as to the extent of the interest of the respondents in the bill, and the respective amounts they are liable to refund before making any deductions for rents, timber, &c., are: First, that Emerson had a right, under the written power, as agent and trustee for all the parties, to the title of the whole premises,—each of them as principal having a claim to one undivided fourth; and, secondly, that Emerson, receiving the whole consideration, as agent for all, is to refund the whole under the decree; but having paid over one third of it to each of the others, they are in aid of him to refund that proportion respectively, and he be held answerable only for the balance not paid by them; and, thirdly, that the reconveyance of this one eighth is then to be made, in the form reported by the master, to Emerson alone, in trust for and as agent for the others —they being entitled to receive a deed from him of such portions of the one eighth as each refunds of the whole amount directed to be returned.

In respect to the next point, to which the exceptions relate—the time for which interest is to be allowed—it is not without some difficulty. In cases where contracts are rescinded for mere mistakes, and the property sold was taken possession of by the vendee, and yielded a regular income, it has often been the practice to set off the income against the interest, and to go into no computations about either, till possession of the premises was given up. Edwards v. McLeay, 2 Swanst. 287; Powell v. Martyr, 8 Ves. 146; 1 Dana, 423, 594; 2 Dana, 375; 3 A. K. Marsh. 180. Such a rule is often more convenient and easy than just; and could never be equitable unless the property yielded a certain and considerable income. Where interest has in any such cases been given, it usually does not begin till a demand is made

to refund the consideration. Powell v. Martyr, 8 Ves. 146. But here the original bill charges a fraud in the contract of sale, as one ground for rescinding it. The opinion of the court on that bill was, "that the contract ought to be set aside, as founded in gross mistake, and gross misrepresentations." Not in one, or the other, but in both; and though there may be a mistake in cases, sometimes with and sometimes without misrepresentation, it is difficult to conceive of "gross misrepresentations" without fraud. If they do not always imply actual fraud, or a scienter which would make the party liable criminally, they implied in this case, according to the court, a fraud in law, which annulled the whole sale. But beside this the decree itself states both "misrepresentation" and "deceit" as entering into the transaction; and the ordinary definition and use of the latter term is the same as that of fraud. Though not employing the precise word "fraud," the whole case, as well as the decree, manifestly shows that the sale was avoided as well on account of fraud as of mistake, and the former word was not used, either from inadvertence or from a kindly feeling to employ a term seeming less harsh, to describe what the law regarded as coming within its purview and meaning. The usual incidents to such a decision must, in the next place, be attached to it. One of them is, that no demand is necessary in order to obtain interest from the time the demand is made. But on the contrary, the taking of the money being wrong and fraudulent in law, the law will grant interest upon it from the time it is so taken. Forster v. Forster, 1 Ves. Jr. 451, and note; Schieffelin v. Stewart, 1 Johns. Ch. 620; Evertson v. Tappen, 5 Johns. Ch. 497; 2 Story, Eq. Jur. § 1277. It seems to me more just and equal for the parties, that in all cases of rescinded contracts, interest be allowed on the money paid from the time of payment till the judgment; and on the other hand, the party occupying the land be charged with rents and profits during the possession, deducting taxes, and the cost of any permanent improvements made. Powell v. Martyr, 8 Ves. 146; Taylor v. Porter, 1 Dana, 423. Because in some cases the rents are little or nothing, and in others more than the interest. This rule was recently adopted by the supreme court in Michoud v. Girod, 4 How. [45 U. S.] 503.

In respect to the sums or amounts, on which interest is to be cast, if the bargain had been to pay a particular sum in money for the whole consideration, and notes had been voluntarily taken in part as a substitute, it would seem to me proper, as the master has reported, to cast interest on all as if money. The interest then would be from the time of the making of the contract, the execution of it, to the time of final judgment on the whole consideration, and nothing more. But as this is not the truth of the case, and a part only of the

consideration was to be paid at the time in money, and the rest on credit, I am inclined to think the interest should be computed according to the truth of the transaction, and hence should be cast on the different sums paid from the times actually paid, whether as principal or interest, until the time of the final judgment. This will give some interest on interest, where it has actually been paid on a note on which an original credit was stipulated; but it will conform to the truth of the case, and restore the party to no more than he has really lost. In England, breaks or interruptions are sometimes countenanced in the payments, in order to allow compound interest. See cases in Vesey before cited, and notes.

The only remaining question, raised by the exceptions, is, whether the respondents shall refund, as principal, the amount paid by the complainant to this agent or sub-agent,—Williams,—or only the amount which the three respondents, beside Emerson, received after paying to Williams the excess that he was by the contract to be allowed over five dollars per acre. It is certain that the plaintiff contracted to pay for the one eighth, the whole amount of $6.50 per acre. It is equally certain, that he paid that amount for the land. It is further manifest, that the respondents are charged as liable to refund what was paid on that contract on account of the fraud and mistake accompanying it. It is also manifest that the fraud entered into and contaminated the whole $6.50, and not merely the $5 per acre, and that the contract set aside was one for $6.50, and not $5 per acre. And that the respondents would not have got or taken the $5 to themselves, except for the $6.50 paid to their agent or sub-agent, and of which he retained $1.50 for his services. It is likewise clear, that the sum paid to an agent on a contract, is in law generally considered as paid to the principal. It is as clear, that what the agent retains by agreement for his services, is as much paid to the principal, or in other words, to the agent on account of the principal, as if it all passed through the hands of the principal himself. Nor can the grounds of justice or law be satisfied when setting aside a contract for fraud, unless all is refunded, which was paid on it, whether a portion was at first retained by the agent, who conducted the business, or whether it was all passed over to the principal, and the same portion repaid by him to the agent for the services of the latter. Still cases may exist, where equity does not require those who may be parties to the bill to refund the whole; but this is not one of those cases. Another view of the transaction strengthens this conclusion in the present case, and removes any doubts remaining. All the $6.50 per acre was in fact paid over to the principals by the agent and sub-agent, but the sub-agent was allowed to take a conveyance of another one eighth of the same township, on paying only the difference between its cost at $5 per acre, and the $1.50 per acre to be allowed to him on the sale to the plaintiffs. So that in reality, all the sums paid to Doggett went into the hands of the respondents; but $1.50 per acre of it was allowed on or deducted from what Williams, the sub-agent, would otherwise have been required to pay on the one eighth he purchased for himself. Indeed, but for this last circumstance, I would not be understood as charging the parties to the bill for notes, if any existed, that ran to one not made a party to the bill, and the money on which never came into their possession, and to surrender which, if still unpaid, they might possess no power. That point I leave to be settled when it shall arise. But on the facts here stated, the whole sum, notes and money, paid by Doggett as principal, all going to the respondents, must be refunded, after the deductions before directed.

The exceptions to the master's report, which are sustained by these views, are to prevail; and those which are overruled by those views are not to prevail, and judgment must be entered up on the decree accordingly. It is supposed that the clerk and the parties can make the computations, and draw up the conveyances to conform to this opinion on the decree; but if they cannot without difficulty and delay, let the same master do it on a re-commitment, and make further report early, at the next term.

After the pleadings were closed in this case, and the evidence published,—indeed since the argument on the merits was finished and judgment pronounced against the respondents,—an application has been made by Norcross, one of them, to put in as evidence under a cross-bill, a discharge obtained by him in bankruptcy. It does not appear yet with exactness when Norcross was discharged. The discharge is sworn to be lost, and no copy or duplicate is produced. He shows no efforts to file the plea of it till April, 1845, and it is said to bear date as early as November, 1843. Some time elapsed between the discharge and those efforts, and that delay is not accounted for in any way. There was negligence in not employing counsel and feeing them until April, 1845; or if Norcross then had counsel who were apprized of Norcross's wish to have the bankruptcy pleaded, no reason is known why it was not done at May term, 1845; unless it may then have been considered too late. No explanation is given of this in the papers, and I am not aware of any ground of accident, or mistake, or fraud, made out to justify permitting a cross-bill to set out the discharge now, and attempt to defeat the claim of the plaintiff by it, or permitting all the existing pleadings to be set aside, and this discharge now to be interposed, after an unsuccessful attempt to get rid of the case on the merits, and after an omission to have

the discharge pleaded as soon as it was obtained. A remedy by a rehearing, or bill of review, has been referred to in the argument, but neither would be of any avail without a cross-bill or new pleadings under this bill. To grant either of these, on the facts now before the court, would be to encourage negligence, and favor, as a defence, what is inequitable, certainly, in this stage of the proceedings. Young v. Keighly, 16 Ves. 348; 1 Story, Eq. Pl. § 414; Baker v. Whiting [Case No. 786]; 2 Atk. 177, 533.

There is another fact stated as to this, which is material. It is said that the discharge was obtained before the supplemental bill was filed; and, under a full knowledge of its existence and the possession of it, no plea was then put in as the law requires. Eden, Bankr. Law, 425; 12 East, 664. Nor is it shown that any attempt was then made to give it in evidence under the general pleadings in the case. Where a claim in suit is one, which could be properly proved before a commissioner in bankruptcy, and after the pleadings are closed, a discharge has been obtained, it is usual to plead it as a defence at the very next term, happening after the last continuance. Nor am I aware of any practice to allow it to be pleaded afterwards, when long delays have intervened, unless a good excuse is given for the delay, and on suitable terms. Surely it ought not to be so long after, that the proceedings in the bankrupt court are closed, and all dividends made, and more especially if the claim was one, as here, about which real doubt existed as to its being legally provable before a commissioner. It would be unjust in such a case to make the creditor discontinue, and risk the proof, unless the defendant, if he can, seasonably drives him to it by a plea. Cook, Bankr. Law, c. 6, § 2. But however that may be, I am also satisfied, that if allowed to be now pleaded, notwithstanding the delays, the present claim in controversy is not of a character rendering it proper to have been proved and tried in the bankrupt court. It is manifestly not a claim on a contract to enforce it. Nor is it a suit to recover a debt. Almost every section of the bankrupt laws refers to debts. Generally, too, it must be a debt that the party can swear to in amount (Cook, Bankr. Law, 187, 225; 4 Burrows. 2,446); one, required formerly to be due at the time of bankruptcy (3 Wils. 271); one, ascertainable, though a tort, without a jury; and one, not contingent, till of late years. There must also be no wrong or malconduct in the debtor beyond neglect. 3 Durn. & E. [3 Term R.] 539; Cook, Bankr. Law, 223; Parker v. Norton, 6 Durn. & E. [6 Term R.] 695; Banister v. Scott, Id. 489. Utterson v. Vernon, 4 Durn. & E. [4 Term R.] 570, overruled 3 Durn. & E. [3 Term R.] 539, and sustained the above position.

It will thus be seen, that a bankrupt who has acted fairly, still remains liable in many cases of damages, torts, &c. (Cook, Bankr. Law, 221), on account of the nature of his liability. The same result still follows in some cases of debt, when payable in futuro or when contingent, though several have in later days in England been obviated by special clauses in new acts of parliament, as they have here, and some by exceptions well established in the courts of law. Thus damages, as well as debts, may sometimes be proved, if liquidated or fixed and certain. In this case, however, if any damages can be given, they are unliquidated, and might extend not only to the money received by Mr. Norcross, but if the notes of the plaintiff existed and were in a situation not to be surrendered, the damages might cover their amount also.

The objection here then is, not that the damages, if allowed at all, could not in one event be settled without the intervention of a jury; but that, in other events, they might not be conveniently; and that it is entirely uncertain or contingent whether any damages whatever will ever be allowed,—the claim set up being rather for a rescission of the contract, than for any debt or damages of any kind, or to any extent. Utterson v. Vernon, 4 Durn. & E. [4 Term R.] 570; Goodtitle v. North, 2 Doug. 583. If a right to damages at all is in dispute or uncertain, and not the amount of them, the claim cannot be proved. Eden, Bankr. 130; Cullen, 110; Dusar v. Murgatroyd [Case No. 4,199]. In bills to rescind contracts, often no damages can be given, but merely the sale vacated. It is true, that now, though not formerly, future debts can be proved under special clauses in the bankrupt law, and some contingent ones may be, as where the contingency occurs before the proceedings are finished. This may be right in such case, and in some others also it "may be" done, but seems to be left optional with the creditor. The spirit of none of the exceptions, however, appears to reach a case like this, when the claim is not for either a debt or damage, contingent or otherwise. but for a rescission of a contract. In the next place, it is very doubtful whether a discharge in bankruptcy can be pleaded against any claim resting merely in equity and not in law. Medlicot's Case, Strange, 899; Hillyard's Case, 2 Ves. Sr. 407, 1 Atk. 147; 1 P. Wms. 783; Eden, Bankr. 42. A claim for relief in a court of equity is a naked equity, and not a trust, right, or interest, and cannot be assigned to another. Dunlap v. Stetson [Case No. 4,164]; 5 Maule & S. 228; 2 P. Wms. 491; 8 Ves. 583. How could it then be proved in case of bankruptcy as a "debt"? Nor does a commissioner usually seem a proper or competent tribunal for trying complicated disputes in equity. So a bankrupt's discharge is not valid against a suit or claim founded on fraud in the defendant. Parker v. Norton, 6 Durn. & E. [6 Term R.] 695; Goodtitle v. North, 2 Doug. 583. And here

fraud was alleged and found. Liab'lity for fraud implies something more than mere debt or liability on a contract, and unless the damages have been previously liquidated by a judgment, and then the liability is on that rather than the original cause of action, it will be difficult to find a case where a claim of that character is discharged by the bankrupt laws. See cases before cited. This motion is, therefore, overruled.